## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| **Plaintiff/Respondent,** | |
| **v.** | **No. 11-40078-06-JAR** |
| **KENNIN DEWBERRY,** | |
| **Defendant/Petitioner.** | |

## MEMORANDUM AND ORDER

This matter is before the Court on Petitioner Kennin Dewberry's Motion to Vacate, Set Aside, or Correct Sentence pursuant to 28 U.S.C. § 2255 (Doc. 779).  The Government has responded (Doc. 790).  Counsel for Dewberry subsequently moved to withdraw and the Court ordered the parties to expand the record (Doc. 805).  After counsel was permitted to withdraw, Dewberry filed *pro se*, Motion for Leave to file additional claims (Doc. 812), Response to the Court's directive to expand the record (Doc. 813), Motion for "unfettered access" to discovery materials (Doc. 819), and Motion for Evidentiary Hearing (Doc. 827).  The Government also filed a response expanding the record (Doc. 808) and objected to Dewberry's motion to file additional claims (Doc. 813).  The Court denied Dewberry's request for leave to file additional claims without prejudice to file a motion for leave to amend, attaching a proposed amended motion (Doc. 829); Dewberry did not move for leave to amend and the deadline for doing so has expired.  For the reasons explained below, Dewberry's motion is denied without an evidentiary hearing.

I.      **Procedural History**

On October 19, 2011, Dewberry and seven co-defendants were charged with conspiracy to distribute 280 grams or more of crack cocaine (Count 1) and conspiracy to distribute 5 kilograms or more of powder cocaine (Count 2).  The Court subsequently granted Dewberry's motion to sever trial from the remaining co-defendants.[1]  Dewberry proceeded to trial, with all but one of the other co-defendants entering into plea agreements with the Government.[2]  On July 25, 2013, Dewberry was convicted by a jury on both charges.[3]  The jury also returned special verdicts determining that Dewberry conspired to distribute 280 grams or more of crack cocaine and 5 kilograms or more of powder cocaine.[4]  This Court sentenced Dewberry to the statutory mandatory minimum term of 240 months on Count 1 and 168 months on Count 2, to run concurrently.[5]  On June 23, 2015, the Tenth Circuit Court of Appeals affirmed Dewberry's conviction and sentence.[6]  This timely § 2255 motion followed.[7]

---

[1]Doc. 309.

[2]On March 6, 2014, co-defendant Marcus Roberson was convicted by a jury of conspiracy to distribute crack and powder cocaine and murder to prevent the victim, Crystal Fisher, from telling law enforcement about the other charged crimes.  Doc. 525.

[3]Doc. 388.

[4]*Id.*

[5]Doc. 476; 21 U.S.C. § 841(b)(1)(A).

[6]*United States v. Dewberry*, 790 F.3d 1022, 1036 (10th Cir. 2015).

[7]28 U.S.C. § 2255(f).

## II.    Facts of the Case and Trial Proceedings

### A.  Trial

At trial, the Government presented evidence from Sergeant Joshua Brown of the Junction City Police department, as well as members involved in Virok Webb's organization, including Jamaica Chism, Alisa Escobedo, Antonio Cooper, Megan Fuller, and Michael Lillibridge.[8] Chism, Escobedo, and Fuller were charged as co-defendants in the underlying case, and entered into plea agreements with the Government and testified in the hope of receiving a reduced sentence in exchange for their truthful testimony.[9]  In separate cases, Cooper entered a plea to a federal gun charge and Lillibridge entered a plea to a state drug-related charge.[10]

### *Sergeant Brown*

Co-defendant Virok Webb was the leader of a powder and crack cocaine drug ring in Junction City, Kansas.  During 2009 and 2010, Sergeant Joshua Brown, with the Junction City Police Department, began an investigation into Webb's drug-dealing activities.[11]  Sgt. Brown determined that Webb was selling drugs in both Junction City and Manhattan, Kansas.[12]  Sgt. Brown initiated a long-term investigation into Webb's drug-trafficking activities, iusing

---

[8]*Id.* at 48, 94, 132, 197, 257.

[9]*Id.* at 69, 95–96, 197–98.

[10]*Id.* at 133–34, 277–78.

[11]Trial Tr. at 17–18.  The transcripts of the jury trial consist of four volumes found at Docs. 412 through 415, and collectively consist of 467 sequentially paginated pages.  For convenience, the Court cites to these documents collectively as "Trial Tr." followed by a reference to the page number in the transcript that appears in the upper right corner of each page.

[12]*Id.* at 18.

numerous investigative techniques including global positioning system ("GPS") units on vehicles, confidential informants, controlled buys, and surveillance.[13]

As a result of this investigation, Sgt. Brown determined that Webb was the leader of a drug distribution organization that included several members who performed distinct roles to carry out their distribution activities.[14]  Webb was "at the top" of the organization, and after obtaining cocaine from his supplier, would in turn supply that cocaine to several others, including Antonio Cooper, Marcus Roberson, Jermaine Jackson, Jamaica Chism, and Alisha Escobedo, who would sell the drugs to "sublevel dealers as well as drug users."[15]

One of Webb's sources of supply was Sammy Ray Smith, who lived in Wichita, Kansas.[16]  Smith supplied Webb until he was shot and killed in 2009.[17]  After Smith's death, Webb secured his half-brother, Kennin Dewberry, as another source of supply for cocaine.[18] Dewberry lived in Kansas City, Missouri.

### Jamaica Chism

Chism is the mother of Webb's child.[19]  From at least 2008 to 2011, she sold drugs for Webb on a daily basis and distributed both crack and powder cocaine.[20]  Alisha Escobedo was a

---

[13]*Id.* at 19.

[14]*Id.* at 25–28.

[15]*Id.* at 25, 29.

[16]*Id.* at 30.

[17]*Id.* at 30–31.

[18]*Id.* at 31.

[19]*Id.* at 50.

[20]*Id.* at 51–52.

driver for the organization.[21]  Webb instructed Chism to direct Escobedo to drive to Kansas City, where Escobedo obtained drugs from Dewberry.[22]  On a couple of these occasions, Chism traveled with Escobedo to meet Dewberry.[23]  Webb and Roberson gave them the money Chism and Escobedo took to pay Dewberry in exchange for powder cocaine; Chism and Escobedo then took the powder cocaine back to Junction City, where other members of the organization cooked some of the powder cocaine into crack cocaine.[24]  On one occasion, Chism and Webb traveled to Kansas City together to obtain cocaine from Dewberry.[25]  Webb stored the cocaine in conspiracy members' houses:  one was rented in Escobedo's name, another in Crystal Fisher's name.[26]

Chism testified that in her view, Webb was at the top of the organization; below him in the hierarchy were Roberson and Cooper; below them was Chism; and below her was Escobedo.[27]  Crystal Fisher was an errand runner.[28]

### *Alisha Escobedo*

Escobedo met Webb through Chism in 2008.[29]  In 2009, Webb asked her to drive him to Wichita, and later Kansas City, to pick up drugs.[30]  She testified that Roberson, Cooper, and

---

[21]*Id.* at 54–56.

[22]*Id.* at 55–57.

[23]*Id.* at 57–58.

[24]*Id.* at 57, 59–61.

[25]*Id.* at 67–68.

[26]*Id.* at 66–67.

[27]*Id.* at 62.

[28]*Id.*

[29]*Id.* at 95.

[30]*Id.* at 96–100.

Jackson all sold drugs for Webb, who was in charge of the group.[31]  Chism directed her to drop off or pick up money or drugs in Junction City and sometimes Manhattan.[32]

Between the end of 2009 and mid-2010, Webb told Escobedo to go to Kansas City to a residence that was identified as Dewberry's.[33]  She testified that she went to Dewberry's residence "maybe ten to twenty times" to "pick up drugs."[34]  Escobedo always drove with another member of the organization, including Fisher and Mike.[35]  She testified that Webb referred to the person who lived at this residence as his "little brother."[36]

Escobedo testified that she knew she was getting drugs because she "would see it when we would get back to Junction [City]."[37]  She explained, "We would either go to Jamaica's or Virok's, and they would—they were picking up cocaine so they would either cook it into crack or bag it up."[38]  She sat and waited while this occurred.[39]  She did not know the amounts obtained on the trips, and was paid for her services with drugs.[40]

---

[31]*Id.* at 101–02.

[32]*Id.* at 104.

[33]*Id.* at 104–06, 296; Gov't Ex. 1.

[34]*Id.* at 107.

[35]*Id.* at 107, 109, 122.

[36]*Id.* at 108.

[37]*Id.*

[38]*Id.*

[39]*Id.*

[40]*Id.* at 116, 123.

### Antonio Cooper

Cooper first met Webb in 1997 before Cooper went to prison sometime in the 2000's.[41] Upon being released in 2009, Cooper reconnected with Webb through Jermaine Jackson.[42] After that meeting, Webb fronted Cooper with some crack, which Cooper sold.[43] In 2009, Webb told Cooper that he had a source in Wichita, nicknamed "Ray Ray," who supplied Webb with crack.[44] Ray Ray was supplying Webb with 18 to 36 ounces of pure crack for $700 to $750 per ounce.[45] Cooper traveled with Webb to Wichita to pick up the crack from Ray Ray.[46] In 2009, Webb sent Escobedo and "White Mike" to Wichita once or twice a week to get crack from Ray Ray; they returned with approximately 18 to 36 ounces of crack, which Webb redistributed to Cooper, Roberson, and Jackson.[47]

Cooper explained that several individuals performed distinct roles in Webb's organization. Webb was the "shot-caller" of the organization and negotiated with the sources of supply.[48] To buy more drugs from Webb's sources, Cooper, Roberson, and Jackson pooled their money and gave it to Webb to buy more drugs.[49] Webb told them when to get the money

---

[41]*Id.* at 135–36.

[42]*Id.* at 136–37.

[43]*Id.* at 139–40.

[44]*Id.* at 141.

[45]*Id.* at 142.

[46]*Id.* at 143.

[47]*Id.* at 144–45.

[48]*Id.* at 146–47.

[49]*Id.* at 148–49.

together.[50] "White Mike" and Crystal Fisher would drive to get the drugs and distribute them.[51] Escobedo's role was to drive to get the drugs from the sources, and Chism would help distribute.[52]

When Ray Ray died in 2009, the organization had to find a new source of supply.[53] Around this time, Webb told Cooper that he had a new source of supply in Kansas City, Webb's half-brother, whom Cooper identified as Dewberry.[54] Cooper met Dewberry at Dewberry's residence in Kansas City, Missouri, where Cooper went "a few times" to purchase powder cocaine from Dewberry, who was now the sole source of supply for Webb's organization.[55] Webb made arrangements with Dewberry to purchase drugs through a chirping system on his cell phone.[56]

Cooper testified that once members of the organization returned from Kansas City with the package of drugs, Webb took possession, weighed, separated, and distributed the drugs.[57] Webb stored the drugs at Chism's or Keishana Johnson's residences.[58] Members turned some of the powder cocaine into crack through a cooking process; they then broke down the drugs into ounce quantities, which Webb distributed to Cooper, Roberson, and Jackson, who broke the

---

[50]*Id.* at 152.

[51]*Id.* at 145–46.

[52]*Id.* at 146.

[53]*Id.* at 150–52.

[54]*Id.* at 154–55.

[55]*Id.* at 156–58.

[56]*Id.* at 158–59.

[57]*Id.* at 160.

[58]*Id.* at 161.

crack down into pieces and resold it for $20 or $50 per piece.[59]  They used the money from these sales to buy more cocaine.[60]

Webb obtained between 4 ½ and 9 ounces of powder cocaine once or twice per week from Dewberry in Kansas City.[61]  Webb's organization either converted this powder cocaine into crack or expanded it into more cocaine.[62]  Webb depended on Dewberry for cocaine, and Cooper depended on Webb for cocaine.[63]

### Megan Fuller

Megan Fuller met Webb in 2007 through Webb's girlfriend, Caress Jackson.[64]  Fuller taught Webb a "trick," which she learned from a boyfriend, that involved adding ingredients to powder cocaine to double the amount of powder.[65]

When Fuller first started associating with Webb, Webb's source was Ray Ray in Wichita.[66]  Cooper and Roberson sold drugs for Webb; Escobedo, Chism, and Fisher also distributed drugs for Webb.[67]  Escobedo and Mike also served as drivers.[68]  Webb stored drugs in

---

[59]*Id.* at 162–63.

[60]*Id.* at 164.

[61]*Id.* at 164, 167, 169.

[62]*Id.* at 164–65.

[63]*Id.* at 166.

[64]*Id.* at 198–99.

[65]*Id.* at 202–04.

[66]*Id.* at 204–05.

[67]*Id.* at 205–07.

[68]*Id.*

Fisher's apartment, and Cooper and Roberson went there to pick up drugs.[69]  Fuller testified that

Webb was at the top of the organization and others worked at his direction.[70]  The people under

Webb depended on him to get their drugs.[71]  Fuller associated with Webb on an almost-daily

basis.[72]

Webb introduced Fuller to Dewberry in 2010.[73]  Fuller, who lived in Kansas City, saw

Dewberry on a weekly basis in Webb's presence for the purpose of obtaining cocaine.[74]  Webb

got powder cocaine from Dewberry's residence.[75]  At Webb's direction, Fuller traveled to

Dewberry's house in Kansas City to obtain powder cocaine "roughly 10 times," and Webb was

usually with her.[76]

Dewberry had a second residence in Kansas City where he stored his cocaine.[77]  Fuller

went there with Dewberry and Webb, where they expanded the amount of cocaine using the

"trick" Fuller taught Webb.[78]  At this second residence, they broke down the drugs, weighed

---

[69]*Id.* at 208.

[70]*Id.* at 209–10.

[71]*Id.* at 210.

[72]*Id.* at 209.

[73]*Id.* at 210–11.

[74]*Id.* at 212.

[75]*Id.* at 212–13.

[76]*Id.* at 215.

[77]*Id.* at 216–17.

[78]*Id.* at 216–20.

them, and divided them.[79]  Fuller went to this residence five or six times.[80]  Webb usually paid

Dewberry for the cocaine through wire transfers.[81]  The drugs were then transported back to

Junction City for redistribution.[82]  For every ounce of cocaine that Webb obtained, he either

converted it into crack cocaine or doubled its volume using Fuller's trick.[83]

### Michael Lillibridge

Michael Lillibridge began purchasing crack cocaine from Webb in 2009.[84]  A couple of

months after meeting Webb, he asked Lillibridge if he could borrow his car to go to Wichita or

Kansas City.[85]  Lillibridge eventually learned that others helped Webb as part of Webb's drug

trafficking organization, including Chism, Fuller, Fisher, Cooper, Jackson, and Roberson.[86]

Lillibridge became a member of the organization, and drove to Wichita to pick up drugs

for Webb, often with Fisher.[87]  He delivered the drugs to Webb, Roberson, or Roberson's

girlfriend.[88]  Webb paid Lillibridge for his services with crack.[89]

---

[79] *Id.* at 219–20.

[80] *Id.* at 223.

[81] *Id.* at 221.

[82] *Id.* at 223.

[83] *Id.* at 224–25.

[84] *Id.* at 259–60.

[85] *Id.* at 261–62.

[86] *Id.* at 263–65.

[87] *Id.* at 265–67.

[88] *Id.* at 268–69.

[89] *Id.* at 269.

After Webb's source of supply in Wichita died, Webb directed Lillibridge to drive to Kansas City to pick up drugs from Webb's brother, whom Lillibridge identified as Dewberry.[90] Lillibridge met Dewberry approximately six times and went inside his residence three or four times to pick up drugs; Fisher went with him on these occasions.[91]  After obtaining the drugs from Dewberry, they transported them to Junction City.[92]  Lillibridge also went to Dewberry's residence with Webb to get drugs.[93]  On one occasion, Webb and Lillibridge went to Webb's grandmother's residence, where Lillibridge met Dewberry who had the drugs with him; they cooked them, meaning they "[t]urned powder into rock."[94]

### *Verdict*

The jury convicted Dewberry on both counts.[95]  The jury also returned special verdicts pertaining to the amount of drugs and finding Dewberry conspired to distribute 280 grams or more of crack and 5 kilograms or more of powder.[96]

Dewberry moved for a new trial under Fed. R. Crim. P. 33 on sufficiency of the evidence grounds and that testimony of trial witnesses was not credible.[97]  The Court denied Dewberry's motion.[98]

---

[90]*Id.* at 269–70.

[91]*Id.* at 271–72.

[92]*Id.* at 272–73.

[93]*Id.* at 274.

[94]*Id.* at 274–75.

[95]Doc. 388.

[96]*Id.*

[97]Doc. 394.

[98]Doc. 542 at 13–15.

### B. Sentencing

The Amended Presentence Investigation Report ("PSIR") determined the trial evidence established that Dewberry provided Virok Webb between 4.5 and 9 ounces of cocaine per week from at least October 1, 2009 to February 28, 2010.[99]  The PSIR recommended that Dewberry be held accountable for 4.5 ounces per week for 21 weeks.[100]  The PSIR then estimated that out of the 4.5 ounces of powder cocaine Webb received weekly, he converted 2.5 ounces into crack, for a 21-week total of 52.5 ounces or 1,488.375 grams of crack, which equals 5,314.98 kilograms in marijuana equivalent.  The remainder of the weekly powder cocaine, 2.0 ounces, was doubled to 4.0 ounces by employing the trick, for a 21-week total of 84 ounces or 2,381.40 grams of powder.  This equals 476.28 kilograms in marijuana equivalent.  The crack and powder cocaine calculations in total equaled 5,791.26 kilograms in marijuana equivalent.[101]

The PSIR calculated Dewberry's base offense level at 34, with no enhancements or reductions.[102]  Combined with a criminal history category of II, the resulting Guideline range was 168 to 210 months.[103]  But the PSIR noted Dewberry faced a mandatory minimum sentence of 20 years on each count based on the quantity of drugs distributed and his prior felony conviction.[104]

---

[99]Doc. 453, ¶ 25.

[100]*Id.*

[101]*Id.* ¶¶ 26, 27.

[102]*Id.* ¶ 32.

[103]*Id.* ¶ 75.

[104]*See* 21 U.S.C. § 841(b)(1)(A).

Dewberry objected to the PSIR's crack cocaine calculation, noting that only Lillibridge's testimony implicated him in any crack-related activities.[105]  Dewberry argued that this testimony, which concerned a single cook of 3.5 grams of cocaine, did not establish that the large quantities of powder Webb converted into crack cocaine were reasonably foreseeable to Dewberry.

At the sentencing hearing held January 27, 2014, this Court overruled Dewberry's objection to the PSIR's crack cocaine calculation.[106]  On the issue of foreseeability, the Court noted, "Mr. Dewberry wasn't engaged in selling crack cocaine; he was engaged in selling powder cocaine to Mr. Webb, who in turn turned it into crack cocaine.  The reason it's reasonably foreseeable to Mr. Dewberry that Mr. Webb was doing that is that he witnessed Mr. Webb turning it into crack cocaine on at least one occasion, and in fact helped him do it."[107]  The Court relied on the testimony of Lillibridge that Dewberry witnessed Webb cooking powder into crack:  "Whether it was one occasion or 200 occasions, what that evidence illustrates is that Mr. Dewberry was aware that Mr. Webb distributed crack cocaine, that he was at least turning part of the powder cocaine into crack cocaine."[108]  The Court further noted, "Megan Fuller, though, also testified that Mr. Dewberry was aware of Mr. Webb distributing crack cocaine.  So a reasonable jury could have found that . . . Mr. Dewberry is also liable for the crack cocaine that was distributed with the powder cocaine that he supplied.  And, in fact, that's what the jury found."[109]

---

[105]Doc. 453 ¶ 99.

[106]Doc. 542 at 27–31.

[107]*Id.* at 30.

[108]*Id.* at 30–31.

[109]*Id.* at 31.

On January 27, 2014, Dewberry was sentenced to a statutory mandatory minimum sentence of 240 months on Count 1 and 168 months on Count 2, with the sentences to run concurrently.[110]

### C. Direct Appeal

Dewberry appealed his conviction and sentence to the Tenth Circuit Court of Appeals.[111] Dewberry challenged the sufficiency of the evidence for his two conspiracy convictions, the sufficiency of the evidence for the jury's finding that he was accountable for 280 grams or more of crack cocaine, this Court's imposition of a 168-month prison term on Count 2, and this Court's denial of his initial pretrial motion to sever.[112]  The court rejected Dewberry's arguments and affirmed his convictions and sentence.[113]

### D. Virok Webb

On March 7, 2014, the day after co-defendant Marcus Roberson was convicted by a jury, Virok Webb entered a binding guilty plea to one count of conspiracy to distribute crack cocaine.[114]

On December 20, 2014, Webb sent an affidavit to counsel for Dewberry that stated,

I, Virok Webb, of sound mind and body, Give this truthfull [sic] affidavit concerning the lack of drug activity with the defendant Mr. Dewberry.  We never conspired, participated or was [sic] involved in any criminal drug activity together.  Furthermore, Mr. Dewberry was never aware of any drug or criminal activity that I, Virok Webb, was involved in.  The extent of our relationship was one of shared siblings.  My visits to his residence consist of family visits and a place to reside when I stayed over in Kansas City,

---

[110]Doc. 476.

[111]*United States v. Dewberry*, 790 F.3d 1022 (10th Cir. 2015).

[112]*Id.* at 1024.

[113]*Id.* at 1036.

[114]Docs. 511, 512.

MO.  He was never involved or aware of my activity other than family visits during the times I was in Kansas City, MO.  I am willing to testify to this and was willing to testify at his trial.  My attorney at the time prevented me from this due to my impending trial that was to take place after his.  I was not coersed [sic] nor threatened into writing this truthfull [sic] affidavit. Thank you.[115]

On February 23, 2015, Webb moved to withdraw his plea prior to sentencing on the grounds that in late 2014, his defense counsel learned from defense counsel for co-defendant Roberson, that the government had failed to disclose exculpatory evidence in violation of *Brady/Giglio*.[116]  Specifically, Webb maintained that the Government breached the Plea Agreement by failing to disclose *Brady/Giglio*[117] material, which "created a substantial change in circumstances."[118]  Webb further argued that he had a "strained relationship" with his previous counsel and therefore should be allowed to withdraw his guilty plea.[119]

A hearing was held on Webb's motion to withdraw plea on June 15, 2015.[120]  On July 14, 2015, this Court denied Webb's motion, concluding:

> In short, Webb cannot establish that his guilty plea was entered unknowingly, involuntarily or unintelligently solely because he was not aware that Antonio Cooper provided a statement in a wholly unrelated homicide investigation that occurred approximately 13 years before Webb entered his guilty plea.  Nor can Webb demonstrate that the information about Cooper would have "significantly strengthened [his] hand in plea negotiations even if [this information] had been available to him from the start."  Nor does Webb explain in any way how knowledge [of] this information about Cooper would have played any role in his decision to enter a guilty plea . . . Webb had close assistance of counsel throughout this

---

[115]Doc. 779-1.

[116]Doc. 684.

[117]*Brady v. Maryland*, 373 U.S. 83 (1963); *Giglio v. United States*, 405 U.S. 150 (1972).

[118]Doc. 684 at 1.

[119]*Id.* at 12.

[120]Doc. 699.

case; first with Ms. Rokusek, then with Ms. Rokusek and Mr. Sandage jointly while the case was pending death penalty qualification. Throughout that period, Webb periodically sought new counsel other than Ms. Rokusek and Mr. Sandage, only to relent at every hearing on the motions to withdraw, except the last motion to withdraw, which he filed after he entered his plea. Webb has made no showing that he lacked close assistance of counsel. On the contrary, as the docket sheet in this case reveals, Webb had close assistance of counsel by one or more attorneys throughout this proceeding, who engaged in zealous, professional, and experienced advocacy . . . Accordingly, Webb has not shown a fair and just reason for withdrawal of his plea of guilty, and his request is denied.[121]

Pursuant to the binding Plea Agreement, the Court sentenced Webb to a controlling term of 360 months' imprisonment.[122] His direct appeal was dismissed by the Tenth Circuit.[123]

### E. Expansion of § 2255 Record

After the Tenth Circuit affirmed Dewberry's conviction and sentence, he filed the instant timely § 2255 motion raising six discrete claims that his trial and appellate counsel were ineffective, and a seventh claim that the Government violated *Brady* and *Gigilo* by failing to disclose a statement of Antonio Cooper given to law enforcement in another case and by failing to disclose GPS information. This Court ordered the parties to expand the record to supply sworn statements with respect to Dewberry's first clam that trial counsel refused to interview and present Virok Webb as a witness whose testimony would have exculpated him from the crimes charged.[124]

---

[121]*United States v. Webb,* No. 11-40078-01, 2015 WL 4275949, at *6–7 (D. Kan. July 14, 2015).

[122]Doc. 715, Judgment.

[123]*United States v. Webb*, 651 F. App'x 740, 745 (10th Cir. 2016).

[124]Doc. 805.

The Government submitted the affidavit of Dewberry's trial counsel, Dionne Scherff.[125] Scherff prepared a timeline of her investigation and decisions regarding Virok Webb. In January 2012, Scherff hired private investigator Melissa Jones with Aristocrat Investigation to assist with the investigation and defense of Dewberry's criminal case. On January 31, 2012, counsel had a meeting with Dewberry where Jones was introduced and present. Among other matters, Scherff and Jones decided that an interview of co-defendant Webb should be arranged. Because Webb was represented by counsel, and Rule 4.2 of the Kansas Rules of Professional Conduct prohibited any direct contact with Webb, the request for an interview was made to Webb's assigned counsel, Jacquelyn Rokusek. Scherff states that Rule 4.2 was followed throughout the course of her legal representation of Dewberry.

On March 31, 2012, Jones emailed Rokusek and requested to interview Webb. Rokusek did not respond to this request. On April 18, 2012, Jones sent a letter to Rokusek again requesting to interview her client, Webb. Rokusek replied by email to Jones, and indicated that she would not allow Webb to be interviewed by any outside parties, including Dewberry's counsel or investigator.

On June 27, 2012, counsel had an office meeting with Dewberry. Among the issues discussed was Webb and Scherff's inability to interview Webb because Webb's counsel had declined all requests.

On October 30, 2012, Scherff had a meeting with Dewberry and Jones. One of several issues discussed was Webb and their inability to interview him because counsel had declined.

---

[125]Doc. 808. *See United States v. Pinson,* 584 F.3d 972, 978 (10th Cir. 2009) (holding when a habeas petitioner claims ineffective assistance of counsel, he impliedly waives attorney-client privilege with respect to communications with his attorney necessary to prove or disprove the claim).

Scherff discussed Webb's statements to law enforcement that was included in case discovery, and advised Dewberry that the damaging statement by Webb to law enforcement most likely would be introduced into evidence should Webb be called to testify by either the government or the defense in Dewberry's case.  Scherff further explained to Dewberry the dangers of subpoenaing an individual as a witness without the ability to interview him in advance, and advised that it was not prudent or competent to place an individual on the witness stand without knowing in advance what that witness was expected to state under oath.  Scherff advised Dewberry that all attempts to interview Webb had been declined, and explained that Webb would have the right to exert his Fifth Amendment privilege at Dewberry's trial should he be called to testify.

On June 27, 2013, Scherff sent a letter to Rokusek requesting the opportunity to interview Webb.  Scherff specifically requested that Jones be allowed to conduct an interview with all counsel present.  In this letter, Scherff references the in-person and telephone request previously made to Rokusek for an interview of Webb, and a carbon copy of the letter was sent to Dewberry.  Rokusek denied this request for permission to interview Webb.

On July 18, 2013, Scherff met with Dewberry.  One of the issues discussed was the list of defense witnesses to be called at trial.  Scherff advised Dewberry of the subpoenas issued and service upon each defense witness as well as the relevance of each witness based on their prior statement or interview.

On August 27, 2013, Scherff had a meeting with Rokusek and again requested the opportunity to interview Webb before Dewberry's sentencing.  On that date, Scherff sent a letter to Dewberry documenting the meeting with Rokusek and her decision to once again decline Scherff's request to interview Webb.

On November 21, 2013, Scherff had a telephone conversation with Rokusek, where they discussed the status of Webb's case. Scherff again requested to interview Webb and again, Rokusek denied her request.

With respect to Dewberry's claim, Scherff states the following. First, Scherff avers that she did not have knowledge of Webb's purported willingness to testify at Dewberry's trial. Scherff states that the government provided her with a copy of Webb's affidavit dated December 20, 2014, where he states he wanted to testify at Dewberry's trial. Scherff states that she was no longer the attorney of record for Dewberry in December 2014, and notes the affidavit is not addressed to any attorney by name nor received at her law office. Scherff avers that the information in the affidavit was not provided by Rokusek or Webb while Scherff represented Dewberry.

Second, Scherff states that she did in fact investigate Webb as a potential witness for Dewberry's defense, and made numerous attempts to interview him for any relevant information that might pertain to Dewberry. Scherff states that she felt it was prudent to interview Webb but all of her continuous and consistent requests were declined by his counsel, Rokusek. Although Webb's affidavit states that he wanted to be interviewed by Dewberry's counsel and investigators and counsel, but Rokusek would not allow it, Scherff states that Webb did not contact Jones, Scherff, Dewberry, or Rokusek prior to Dewberry's trial and sentencing with a statement or any information.

Finally, Scherff avers that she diligently reviewed all discovery related to Dewberry's case in order to prepare his defense, specifically: she interviewed witnesses through the assistance of Jones; she made the decisions about defense strategy and defense witnesses pursuant to Kansas Rules of Professional Conduct Rule 1.2; and she did not call Webb as a

witness in Dewberry's trial because there was not an opportunity to first interview Webb and determine what relevant information he had for her client's defense.

Dewberry also submitted an affidavit in response to the Court's directive.[126]  Dewberry states that he continuously advised Scherff that Webb was a family member, but that Dewberry had not been involved with any criminal offenses with him whatsoever.  He states that he advised Scherff that Webb would verify his information and asked her to subpoena Webb to testify at trial.  Dewberry states that Scherff advised that she had contacted Webb's attorney and requested to interview Webb, but her request was denied by his attorney more than once.  Scherff also advised Dewberry that she asked her investigator, Melissa Jones, to try to interview Webb but that she too, had been unsuccessful in getting Webb's counsel to agree to such a meeting.  Dewberry states he asked counsel to assure that Webb himself was getting the message that she wanted to interview him, but at no time did Scherff give him a response to this request.

Dewberry states that he was advised by family members who had contact with Webb that they had talked to him and he advised that he wanted to take the stand and testify on Dewberry's behalf that he was not involved with criminal activity with Webb and that Webb would not invoke his Fifth Amendment protections.  Dewberry states that he advised Scherff of this information, and family members tried unsuccessfully to contact Scherff to advise her of what Webb had told them.

Dewberry states that he asked Scherff if she or Jones would contact Webb personally through a letter or some other means to get a statement or information.  Scherff did not do so nor did she request Jones to do so.  Scherff subsequently advised Dewberry that she would not call Webb as a witness because she could not interview him and know what his testimony would be.

---

[126]Doc. 814.

Dewberry advised Scherff that Webb would testify that Dewberry had not been involved in criminal activity with Webb as he told family members, but Scherff did not attempt to contact family members that had talked to Webb. Dewberry states that he further advised Scherff that he was confident Webb would testify truthfully and that he was willing to take the risk that he would testify that Dewberry had not been involved in criminal activity because there was nothing else he could truthfully testify to. Despite this, Scherff failed to subpoena Webb to testify at Dewberry's trial.

Dewberry avers that throughout the time period prior to trial, he clearly and continuously advised Scherff that he wanted her to get Webb on the stand no matter what his testimony would be, because in Dewberry's opinion, he would surely be convicted based on the false testimony provided by the government's witnesses. In essence, Dewberry had to risk either the jury not believing the government's witnesses or risk that Webb would testify adversely, and he chose to go with Webb. Counsel refused to follow his wishes, however, and consequently Dewberry did not get Webb on the stand.

## III.  Legal Standard

Section 2255 entitles a federal prisoner to relief if the court finds that "the judgment was rendered without jurisdiction, or that the sentence imposed was not authorized by law or [is] otherwise open to collateral attack, or that there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack."[127] The court must hold an evidentiary hearing on a § 2255 motion "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief."[128]  A § 2255

---

[127]28 U.S.C. § 2255(b).

[128]*United States v. Galloway*, 56 F.3d 1239, 1240 n.1 (10th Cir. 1995) (quoting 28 U.S.C. § 2255(b)).

petitioner must allege facts that, if proven, would warrant relief from his conviction or sentence.[129]  An evidentiary hearing is not necessary where the factual allegations are contradicted by the record, inherently incredible, or when they are conclusion rather than statements of fact.[130]

The Sixth Amendment guarantees that "[i]n all criminal prosecution, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence."[131]  A successful claim of ineffective assistance of counsel must meet the two-pronged test set forth in *Strickland v. Washington*.[132]  First, a defendant must show that his counsel's performance was deficient in that it "fell below an objective standard of reasonableness."[133]  To meet this first prong, a defendant must demonstrate that the omissions of his counsel fell "outside the wide range of professionally competent assistance."[134]  This standard is "highly demanding."[135]  Strategic or tactical decisions on the part of counsel are presumed correct, unless they were "completely unreasonable, not merely wrong, so that [they] bear no relationship to a possible defense strategy."[136]  In all events, judicial scrutiny of the adequacy of attorney performance must be strongly deferential: "[A]

---

[129]*In re Lindsey*, 582 F.3d 1173, 1175 (10th Cir. 2009).

[130]*See Hatch v. Oklahoma*, 58 F.3d 1447, 1471 (10th Cir. 1995), *cert. denied*, 517 U.S. 1235 (1996) ("[t]he allegations must be specific and particularized, not general or conclusory"); *United States v. Fisher*, 38 F.3d 1143, 1147 (10th Cir. 1994) (rejecting ineffective assistance of counsel claims that are merely conclusory in nature and without supporting factual averments).

[131]U.S. Const. amend. VI; *see Kansas v. Ventris*, 556 U.S. 586 (2009).

[132]466 U.S. 668 (1984).

[133]*Id.* at 688.

[134]*Id.* at 690.

[135]*Kimmelman v. Morrison*, 477 U.S. 365, 382 (1986).

[136]*Fox v. Ward*, 200 F.3d 1286, 1296 (10th Cir. 2000) (quotation and citations omitted).

court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."[137]  Moreover, the reasonableness of the challenged conduct must be evaluated from counsel's perspective at the time of the alleged error, and "every effort should be made to 'eliminate the distorting effects of hindsight.'"[138]

Second, a defendant must also show that his counsel's deficient performance actually prejudiced his defense.[139]  To prevail on this prong, a defendant "must show there is a reasonable probability that, but for his counsel's unprofessional errors, the result of the proceeding would have been different."[140]  A "reasonable probability" is a "probability sufficient to undermine confidence in the outcome."[141]  This, in turn, requires the court to focus on "the question whether counsel's deficient performance render[ed] the result of the trial unreliable or the proceeding fundamentally unfair."[142]

Claims of ineffective assistance of appellate counsel are also governed by *Strickland's* standards.  To prove that appellate counsel was ineffective under *Strickland*, a defendant must show "(1) constitutionally deficient performance, by demonstrating that his appellate counsel was objectively unreasonable, and (2) resulting prejudice, by demonstrating that but for counsel's unprofessional error(s), the result of . . . appeal . . . would have been different."[143]

---

[137]*Strickland*, 466 U.S. at 687.

[138]*Edens v. Hannigan*, 87 F.3d 1109, 1114 (10th Cir. 1996) (quoting *Strickland*, 466 U.S. at 689).

[139]*Strickland*, 466 U.S. at 687.

[140]*Id.* at 694.

[141]*Id.*

[142]*Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993).

[143]*United States v. Turrentine*, 638 F. App'x 704, 705 (10th Cir. 2016) (quoting *Cargle v. Mullin*, 317 F.3d 1196, 1202 (10th Cir. 2003)).

Although "[a] claim of appellate ineffectiveness can be based on counsel's failure to raise a particular issue on appeal, . . . counsel need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal."[144]  The strength of the omitted issue guides the court's assessment of the ineffectiveness claim.  "If the omitted issue is so plainly meritorious that it would have been unreasonable to winnow it out even from an otherwise strong appeal, its omission may directly establish deficient performance."[145]  "[I]f the omitted issue has merit but is not so compelling, the case for deficient performance is more complicated, requiring an assessment of the issue relative to the rest of the appeal, and deferential consideration must be given to any professional judgment involved in its omission."[146]  And "if the issue is meritless, its omission will not constitute deficient performance."[147] As the Tenth Circuit has explained, the omission of a "dead-bang winner" by counsel is deficient performance that may result in prejudice; a dead-bang-winner is "an issue which was obvious from the trial record *and* one which would have resulted in a reversal on appeal."[148]

A defendant must demonstrate both *Strickland* prongs to establish a claim of ineffective assistance of counsel, and a failure to prove either one is dispositive.[149]  "The performance

---

[144]*Id.*

[145]*Id.*

[146]*Id.*

[147]*Id.*

[148]*United States v. Challoner*, 583 F.3d 745, 749 (10th Cir. 2009) (quoting *United States v. Cook*, 45 F.3d 388, 394 (10th Cir. 1995) (citations omitted)).

[149]*Smith v. Robbins*, 528 U.S. 259, 286 n.14 (2000).

component need not be addressed first. 'If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed.'"[150]

## IV.    Discussion

Dewberry raises six discrete claims that his trial and appellate counsel were ineffective, and a seventh claim alleging that the Government violated *Brady* and *Giglio* by failing to disclose a statement of Antonio Cooper given to law enforcement in another case and by failing to disclose GPS information.  The Court addresses each claim in turn.

### A.  Claim One:  Trial counsel was ineffective for failing to adequately investigate and secure witnesses

#### 1.  Virok Webb

Dewberry complains that trial counsel, contrary to his repeated requests, refused to interview and call Virok Webb as a witness at trial, which would have exculpated him from the crimes charged by the Government.  Dewberry claims that "[h]ad the jury been allowed to hear Mr. Webb's testimony that [Dewberry] was simply a family member who had no involvement in Webb's drug conspiracy, [Dewberry] likely would not have been convicted on the weak evidence."[151]  This claim does not meet either *Strickland* prong.

First, trial counsel's decision not to introduce Webb's testimony is not unreasonable.  A defendant's difference in opinion regarding the method and strategy of trial counsel is insufficient to overcome "the strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."[152]  The decision of which witnesses to call is

---

[150]*Id.* (quoting *Strickland*, 466 U.S. at 697); *see also Romano v. Gibson*, 239 F.3d 1156, 1181 (10th Cir. 2001) ("This court can affirm the denial of habeas relief on whichever *Strickland* prong is the easier to resolve.").

[151]Doc. 779 at 11.

[152]*Strickland*, 466 U.S. at 689.

"quintessentially a matter of strategy for the trial attorney."[153]  Matters of strategy and tactics are significant in ineffective assistance claims because counsel's decisions in those areas "are presumed correct, unless they were completely unreasonable, not merely wrong, so that they bear no relationship to a possible defense strategy."[154]  Generally, whether to call a particular witness is "a tactical decision and, thus, a matter of discretion for trial counsel."[155]  After all, "[u]nlike a later reviewing court, the attorney observed the relevant proceedings [and] knew of materials outside the record."[156]

Moreover, Dewberry's argument is foreclosed by the fact that trial counsel would have violated the Kansas Rules of Professional Conduct had she attempted to speak with Webb without going through his counsel regarding any attempt to have Webb interviewed and testify. As Webb relates in his affidavit, however, his counsel prevented him from testifying.  And as Scherff makes clear in her affidavit, she repeatedly and consistently requested permission to interview Webb, but each time was denied permission from his counsel.

Finally, to establish prejudice from counsel's failure to investigate a potential witness, a petitioner must show that the witness would have testified and that their testimony would have probably changed the outcome of the trial.  As Scherff noted in her affidavit, subjecting Webb to cross-examination would have resulted in the Government's ability to put before the jury Webb's statement to Sgt. Brown wherein Webb brags at length about his high-ranking position in the crack cocaine distribution ring in Junction City and how he controlled the flow of drugs in the

---

[153]*Boyle v. McKune*, 544 F.3d 1132, 1139 (10th Cir. 2008).

[154]*Moore v. Marr*, 254 F.3d 1235, 1239 (10th Cir. 2001).

[155]*United States v. Snyder*, 787 F.2d 1429, 1432 (10th Cir. 1986).

[156]*Harrington v. Richter*, 562 U.S. 86, 105 (2011).

community.  Webb also would have been questioned about the evidence that when his primary source, Ray Ray, was murdered, he obtained his cocaine from another source of supply, whom all of the government's witnesses identified as Dewberry.  Accordingly, Dewberry cannot demonstrate either *Strickland* prong, and this claim is denied.

### 2.  GPS Records

Dewberry claims that trial counsel failed to investigate or follow up on GPS records that were referenced, but not introduced at trial, with "highly prejudicial effect."[157]  The challenged testimony involves a line of questioning wherein Sgt. Brown described the use of GPS devices on the vehicles used by the female co-conspirators to pick up and distribute powder and crack cocaine.[158]  Brown testified that GPS devices were used and that a device had been placed on Megan Fuller's vehicle.[159]  He testified that: (1) Fuller was known to have gone to Kansas City, and (2) a GPS device was used on Fuller's vehicle and at one point in time it indicated a trip from Junction City to Kansas City, Missouri, where the turn-around time in Kansas City was twenty-six minutes.[160]  Brown admitted that he did not know who was in the vehicle and that Fuller lived in Kansas City, Missouri at the time.[161]

Dewberry cannot establish that trial counsel's alleged failure to investigate GPS records impacted the trial in such a way that a different outcome was probable.  Megan Fuller herself admitted that she was a drug runner for Webb and that she was getting narcotics from Dewberry

---

[157]Doc. 779 at 12.

[158]Trial Tr. at 37, 43–45.

[159]*Id.* at 43.

[160]*Id.* at 43−44.

[161]*Id.* at 45.

in Kansas City, Missouri.[162]  Although the GPS evidence, standing alone, might have had some

level of impact, it was rendered superfluous given the detailed testimony of Fuller and her

relationship with Webb and Dewberry and how she interacted with both to distribute cocaine.[163]

Because Dewberry cannot establish a level of prejudice that would justify relief under *Strickland*,

this claim is denied.[164]

### 3.  Evidence Undermining Allegations that Defendant was Distributing Powder Cocaine from his Residence/Member of Conspiracy

In this third sub-claim regarding trial counsel's ineffectiveness, Dewberry states, without

explanation, that

> Counsel failed to investigate and present evidence that would have
> undermined the State's [sic] theory that [the defendant] was supplying drugs
> from his own house, such as evidence that other people other than [the
> defendant] had regular access to the house, that [the defendant's] house is
> extremely similar to the other houses in the neighborhood, and other
> evidence that would have created reasonable doubt as to whether [the
> defendant] had been involved in the alleged drug conspiracy.[165]

Dewberry fails, however, to describe what this "evidence" was that would have

undermined the Government's case, or elaborate on who these "other people" were that had

regular access to his home.  As the Government notes, equally lacking is any description of what

this "other evidence" was that would have created reasonable doubt.  It is Dewberry's

responsibility to demonstrate with particularity what evidence existed that trial counsel failed to

---

[162]*Id.* at 212, 214–15 (testimony that Fuller travelled approximately ten times to Dewberry's house to obtain narcotics).

[163]*Id.*

[164]For the same reasons set forth above, Dewberry cannot establish prejudice on his claims that trial counsel was ineffective by cross-examining Government witness Josh Brown about the use of GPS and for failing to object to the Government's re-direct examination of Brown on the issue of GPS.

[165]Doc. 779 at 10.

discover when alleging that she was ineffective in conducting a proper investigation.[166] Dewberry cannot satisfy either prong under *Strickland* and this claim is denied.

### B.  Claim Two:  Failure to Follow Cohesive Trial Strategy

Dewberry claims trial counsel failed to follow a cohesive trial strategy, which undermined his defense and deprived him of the opportunity to present evidence that would have exonerated him or created reasonable doubt of his guilt.  Dewberry raises multiple issues within this claim, which the Court addresses in turn.

### 1.  Improper Bolstering

It is well established that the prosecution may not personally vouch for or bolster the credibility of a witness.[167]  Dewberry argues that "[t]rial counsel failed to object to . . . repeated improper bolstering by the prosecution."[168]  He highlights two instances of alleged bolstering by reference only to page number in the trial transcript:  Alicia Escobedo ("is there any doubt in your mind that this was the house that you travelled to to get the narcotics?").[169] and Michael Lillibridge ("is there any doubt in your mind that the narcotics you were getting were from the

---

[166]*See Stafford v. Saffle*, 34 F.3d 1557, 1564–65 (10th Cir. 1994) (holding vague and conclusory evidence is insufficient to satisfy *Strickland's* prejudice prong).

[167]*See United States v. Harlow*, 444 F.3d 1255, 1262 (10th Cir. 2006) (explaining that it is not improper for the prosecution to "introduce a witness's plea agreement on direct examination, even if it includes a truthful provision," and to "discuss [that] provision [to] make sure the witness is aware of the consequences of failing to tell the truth" and to "head off claims that the witness' testimony is suspect due to the plea agreement").

[168]Doc. 779 at 15.

[169]Trial Tr. at 126.

defendant?").[170]  Neither line of inquiry personally vouched for the credibility of either witness,

however, and instead focused on the certainty of each witness' involvement in the conspiracy.[171]

### 2.  *James* Hearing

Dewberry claims that trial counsel was ineffective for failing to seek a *James* hearing.[172]

By example, Dewberry states, without support in the record, that "[his] conviction rested

substantially on the admission of statements that would otherwise have been excludible as

hearsay, but were wrongfully admitted at trial."[173]  Again, Dewberry has failed to plead this

specific claim with particularity to the degree that an allegation of prejudice can be subject to

scrutiny.[174]

Even if Dewberry could demonstrate counsel's failure to seek a *James* hearing, however,

he cannot establish prejudice.  Co-conspirator statements are properly admitted into evidence

pursuant to Rule 801(d)(2)(E) if by a preponderance of the evidence, the trial court finds that (1)

a conspiracy existed; (2) both the declarant and the defendant against whom the declaration is

offered were members of the conspiracy; and (3) the statement was made in furtherance of the

conspiracy.[175]  Under Tenth Circuit law, the district court may satisfy the prerequisite for

admission of co-conspirator statements by holding a *James* hearing or by provisionally admitting

---

[170]*Id.* at 277.

[171]*See United States v. Allen*, 610 F. App'x 773, 778 (10th Cir. 2015) (stating government may not personally vouch or bolster the credibility of a witness).

[172]*United States v. James*, 590 F.2d 575 (5th Cir. 1979), *partially overruled by Bourjaily v. United States*, 483 U.S. 171 (1987).

[173]Doc. 779 at 17.

[174]*Cummings v. Sirmons*, 506 F.3d 1211, 1233−34 (10th Cir. 2007) ("[w]ithout more precise identification of what [deficiencies defendant] is referring to," no prejudice can be demonstrated).

[175]*United States v. Johnson*, 911 F.2d 1394, 1403 (10th Cir. 1990).

the statements with the caveat that the government prove the existence of the conspiracy through testimony or other evidence.[176]  The preferred order of proof is first for the district court to hold a *James* hearing "outside the presence of the jury to determine by a preponderance of the evidence the existence of a predicate conspiracy."[177]  At a *James* hearing, the court may consider the hearsay statements sought to be admitted as well as independent evidence when making the requisite findings.[178]  The court has the discretion to consider any hearsay evidence not subject to privilege, regardless of whether or not that evidence would be admissible at trial.

Here, it is clear the Government established the existence of a conspiracy through its witnesses, who described the structure of the conspiracy and the roles each individual played in that conspiracy.[179]  Thus, even if counsel had asked for a hearing, the Government would have prevailed and trial counsel's decision was not objectively unreasonable or prejudicial.

### 3.  Cross-examination of Lillibridge, Fuller and Cooper

Dewberry claims that trial counsel was ineffective for failing to cross-examine Michael Lillibridge thoroughly given his inability to "identify [the defendant's] house from a photo and further statement that all of the houses in the neighborhood looked the same."[180]  He further claims that trial counsel was ineffective for failing to question Lillibridge about Dewberry's home.[181]

---

[176]*United States v. Owens,* 70 F.3d 1118, 1123 (10th Cir. 1995).

[177]*United States v. Lopez-Gutierrez,* 83 F.3d 1235, 1242 (10th Cir. 1996) (citing *United States v. Urena,* 27 F.3d 1487, 1491 (10th Cir. 1994)).

[178]*Bourjaily v. United States,* 483 U.S. 171, 179 (1987); *Johnson,* 911 F.2d at 1403.

[179]Trial Tr. at 25 (Brown); 54–55, 61–62 (Chism); 102–04 (Escobedo); at 145–47 (Cooper); 204–10 (Fuller) and 263–65 (Lillibridge).

[180]Doc. 779 at 15.

[181]*Id.*

Lillibridge testified that he knew the area where Dewberry lived but did not know the exact address.[182]  He further testified that all of the houses in the neighborhood looked the same, but the house in the Government's exhibit looked exactly like Dewberry's house.[183]  Consistent with all of the other witnesses who testified that they too had been inside of Dewberry's home, Lillibridge stated with particularity what the interior of Dewberry's home looked like.[184]  In fact, Lillibridge gave specific detail about the inside of the home and was the key driver for Virok Webb.  Cross-examination about whether he was at the right location would likely not have been productive.  Trial counsel has broad latitude in deciding how to question a witness, and Dewberry cannot establish that counsel's failure to thoroughly cross-examine Lillibridge satisfies both prongs of *Strickland*.[185]

Dewberry further contends that trial counsel should have cross-examined Megan Fuller about her relationship with Virok Webb, specifically the alleged false statements that she was not dating Webb and Fuller's suggestion that Webb was stalking her.  He further maintains that trial counsel should have cross-examined Cooper about the time-line in which he was associating with Dewberry and about Cooper's alleged false statements to Riley County law enforcement.

With respect to cross-examination of Fuller, an attorney's choice of questions to a witness is a tactical decision presumptively reasonable.[186]  Trial counsel's decision not to cross-

---

[182]Trial Tr. at 271.

[183]*Id.*

[184]*Id.* at 271–72.

[185]*See Cannon v. Mullin*, 383 F.3d 1152, 1163 (10th Cir. 2004) ("Decisions on how to question a witness are generally committed to counsel's discretion."); *United States v. Snyder*, 787 F.2d 1429, 1432 (10th Cir. 1986) (counsel's selection of questions is a matter of "strategic choice, as to which [s]he has broad latitude.").

[186]*See  Snyder*, 787 F.2d at 1432 (stating that counsel's choice of cross-examination questions is a tactical decision).

examine on these topics was likely strategic, and Dewberry cites no reason for the Court to depart from the presumption. Nor does Dewberry demonstrate that the jury would have altered its conclusion if Fuller had been cross-examined on these topics.

With respect to cross-examination of Cooper, the same latitude must be given trial counsel. In his testimony, Cooper gave a descriptive background on his involvement in the conspiracy and his association with Webb and Dewberry. Cooper testified that he left prison in May 2009 and reconnected with Webb shortly thereafter to start dealing drugs again.[187] Cooper testified he was able to get crack cocaine and powder cocaine from Webb and begin distributing.[188] Cooper further testified that Webb informed him that he was getting his narcotics from "Ray Ray" in Wichita.[189] When Ray Ray was murdered, Cooper related the story that Webb would now get his cocaine from Dewberry, and that this was approximately in the summer of 2009.[190] Cooper further testified that he stopped getting cocaine from Webb in approximately March of 2010, framing his involvement with Webb and Dewberry from the summer of 2009 to March of 2010.[191] On cross-examination, trial counsel confronted Cooper about his alleged failures to tell law enforcement about Dewberry in the initial interviews. Her decision not to drill down on Cooper's timeline was a strategy within the province of trial counsel, and Dewberry has not demonstrated that the decision was objectively unreasonable. Moreover, Dewberry's argument regarding whether trial counsel was ineffective for failing to cross-

---

[187]Trial Tr. at 136–38.

[188]*Id.* at 139.

[189]*Id.* at 141–43, 148.

[190]*Id.* at 154–57.

[191]*Id.* at 167–68.

examine Cooper about his 2000 statement to Riley County law enforcement officials can be summarily denied, as this particular information did not come to light until approximately sixteen months after Dewberry's trial.  Thus, trial counsel cannot be deemed ineffective for failing to cross-examine a witness about something she and the Government were unaware of.

### 4.  Proffered Statements

Dewberry broadly claims that trial counsel should have more thoroughly cross-examined witnesses about their proffered statements.  As the Government points out, Dewberry fails to point to which witnesses contradicted themselves or where in the record trial counsel should have raised these particular points.[192]

### 5.  Bad Acts

Dewberry argues that trial counsel's questioning of Megan Fuller concerning Dewberry's Facebook postings had no strategic value.  During cross-examination of Fuller, trial counsel inquired whether she had contact with Dewberry on social media.  Fuller indicated she had and further told officers that Dewberry had pictures of marijuana on his account.[193]  During a bench conference on the subject, trial counsel stated that she inquired about Fuller's Facebook password to determine if Fuller provided the password to officers so they could follow up on her allegation about Dewberry's posting a picture of marijuana on his Facebook page.[194]  While the reasons for pursuing this subject with Fuller may arguably be questionable, given the limited nature of this line of questioning, there is no evidence the jury would have altered its conclusion

---

[192]*See United States v. Mealy*, 851 F.2d 890, 908 (7th Cir. 1988) (holding conclusory allegations are insufficient to establish prejudice prong under *Strickland*).

[193]Trial Tr. at 242–43.

[194]*Id.* at 259–60.

absent Fuller's solicited testimony about so-called incriminating evidence on Dewberry's Facebook page.  Thus, Dewberry has not established prejudice and this claim is denied.

### C.  Claim Three:  Government's Information Pursuant to 21 U.S.C. § 851

On February 7, 2012, the Government filed an Information pursuant to 21 U.S.C. § 851 seeking to enhance Dewberry's mandatory minimum sentence pursuant to 21 U.S.C. § 841(b)(1)(A) from ten years to twenty years.[195]  Dewberry claims that trial counsel was ineffective for failing to object to the Government's decision to seek an enhancement pursuant to § 851 or request its withdrawal pursuant to Department of Justice policy.

Dewberry relies on the Tenth Circuit's decision in *United States v. Flowers*,[196] where the court held that trial counsel's failure to raise an objection to the filing of a § 851 notice may constitute ineffectiveness.[197]  In *Flowers*, the government filed a § 851 information with the district court prior to the defendant's guilty plea and faxed a copy to the defendant's attorney.[198] The defendant argued that the district court lacked jurisdiction to impose an enhanced sentence because the government failed to serve the information properly.[199]  The court concluded that "[s]ection 851(a) and its requirements fall neatly within the category of a claim-processing rule," holding that "[w]e now expressly overrule our previous decisions that have improperly designated § 851(a)'s requirements as jurisdictional."[200]  Here, Dewberry does not allege, nor

---

[195] Doc. 149.

[196] 464 F.3d 1127 (10th Cir. 2006).

[197] *Id.* at 1131.

[198] *Id.* at 1128.

[199] *Id.* at 1129.

[200] *Id.* at 1129−30.

can he establish, that the Government failed to timely or properly comply with § 851(a); indeed, the information was filed seventeen months in advance of the trial and there is no allegation that he was not given reasonable notice and an opportunity to be heard.

Nor is there any evidence that trial counsel was ineffective for failing to challenge the prior conviction itself as a qualifying conviction under § 851.  Dewberry's prior federal conviction for conspiracy to distribute marijuana was a well-qualified prior narcotics conviction for use in supporting the § 851 information.  Alternatively, Dewberry argues that trial counsel was ineffective for failing to object to the filing of the § 851 notice on grounds that it ran afoul of the Justice Department's guidelines on filing an information to support an enhanced sentence, commonly known as the "Holder Memo."  The August 12, 2013 Memorandum, however, "is simply a policy statement and does not provide a basis on which a defendant can challenge a mandatory minimum sentence."[201]  The Memo "clearly states that '[t]he policy set forth herein is not intended to create or confer any rights, privileges, or benefits in any matter, case, or proceeding.'"[202]  Thus, such an objection would have been without merit as the decision to file a § 851 information rests exclusively within the executive branch.

Dewberry can neither establish that trial counsel's actions were objectively unreasonable, nor can he demonstrate prejudice, and his third claim is thus denied.

### D.  Claim Four:  Failure to Suppress Witness Identifications

Dewberry next claims that trial counsel was ineffective for failing to move to suppress the statements of several witnesses who identified Dewberry through procedures employed by law enforcement.  Specifically, Dewberry argues that the identification procedure employed by

---

[201]*United States v. Reed*, 576 F. App'x 60, 62 (2d Cir. 2014).

[202]*Id.*

officers when questioning the co-conspirators about Dewberry's identity and residence was unduly suggestive.

In determining whether a pretrial identification procedure is constitutional, the court determines first whether the procedure was "unnecessarily suggestive."[203]  To determine whether the procedure was unnecessarily suggestive, the court considers such factors as the size of the array, the manner of its presentation by officers, and the details of the photographs themselves.[204] If the procedure was unnecessarily suggestive, the court considers whether under the totality of the circumstances, the identification was nevertheless reliable.[205]  In determining the reliability of the identification, the court considers the following factors:

> the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.[206]

The court evaluates the reliability of the identification under the totality of the circumstances to determine whether the suggestive show-up created a substantial likelihood of irreparable misidentification.[207]  Only when a pre-trial identification procedure is so unnecessarily suggestive that it is conducive to "irreparable mistaken identification" does the procedure violate due process.[208]

---

[203]*United States v. Bredy*, 209 F.3d 1193, 1195 (10th Cir. 2000).

[204]*United States v. Sanchez*, 24 F.3d 1259, 1262 (10th Cir. 1994).

[205]*Neil v. Biggers*, 409 U.S. 188, 199 (1972); s*ee Bredy*, 209 F.2d at 1195.

[206]*Neil*, 409 U.S. at 199–200.

[207]*Id.* (citing *United States v. Thody*, 978 F.2d 625, 629 (10th Cir. 1992)).

[208]*Grubbs v. Hannigan*, 982 F.2d 1483, 1490 (10th Cir. 1993) (quoting *Kirby v. Illinois*, 406 U.S. 682, 691 (1972)).

Dewberry claims that the pre-trial identification consisted of witnesses being shown a single photo of Dewberry or his home and being asked if he was the individual who sold drugs to Virok Webb or that was the home where the witnesses obtained drugs.  Dewberry also contends that "several" witnesses only saw Dewberry once or twice in passing, and none gave prior descriptions of Dewberry before being shown the one-photo lineup.  Although Dewberry attempts to minimize the witness' contact, the evidence reveals that witnesses who testified for the Government stated they were familiar with Dewberry and his residence and had, on various occasions, interacted with him at his residence for the purpose of distributing powder cocaine.[209] As the Government notes, Megan Fuller testified she met with Dewberry on numerous occasions, and described weekly interaction with Dewberry when she lived in Kansas City.[210] Without being shown a picture of Dewberry's house, Alicia Escobedo was able to provide agents with directions to Dewberry's house.[211]  Jamaica Chism knew Dewberry well enough to know that he went by "Little Brother."[212]  Michael Lillibridge had met Dewberry approximately six times,[213] and Antonio Cooper was equally familiar with Dewberry and his residence.[214] Moreover, the witnesses were so familiar with Dewberry's residence that they testified similarly

---

[209]Trial Tr. at 154–57 (Cooper); 210–15, 253–54 (Fuller); 270–72 (Lillibridge); 55–59, 76 (Chism); 105, 130 (Escobedo).

[210]*Id.* at 212.

[211]*Id.* at 130.

[212]*Id.* at 55–56.

[213]*Id.* at 270.

[214]*Id.* at 155–56.

to the layout of the home as one enters the front door, specifically that there was a bathroom directly on the left.[215]

Dewberry cannot show that trial counsel was acting unreasonably by foregoing a motion to suppress any of the co-conspirator witness' identification. The record does not establish that the pre-indictment procedures employed by law enforcement were "so unnecessarily suggestive and conducive to irreparable mistaken identification" that it ran afoul of Dewberry's right to due process. This is not a case where the defendant's identity was a critical issue; the conspirators knew each other, worked toward a common objective, and were aware of Dewberry and the layout of his residence. There is simply no evidence or testimony to suggest that the Government's witnesses were unfamiliar with Dewberry to the degree necessary to violate his due process rights.

Nor can Dewberry demonstrate prejudice. Even if the Court had suppressed the pre-indictment identifications based upon the alleged improper procedure, it would not have affected the outcome of the trial given that each witness testified as to their knowledge of Dewberry and that he was directly responsible for supplying the cocaine for the conspiracy. Accordingly, this claim is denied.

### E. Claim Five: Change of Venue

Dewberry claims that trial counsel was ineffective for failing to file a motion to transfer venue to the Western District of Missouri pursuant to Fed. R. Crim. P. 21. The Federal Rules of Criminal Procedure require that "the government must prosecute an offense in a district where the offense is committed. The court must set the place of trial within the district with due regard

---

[215]*Id.* at 83 (Chism); 106 (Escobedo); 156 (Cooper); 271 (Lillibridge).

for the convenience of the defendant, any victim, and the witnesses, and the prompt administration of justice."[216]  This rule is mandated by the United States Constitution.[217]

Here, Dewberry was charged, along with seven co-defendants, with conspiring to distribute powder and crack cocaine.  When a conspiracy is charged, "venue as to prosecution of all members of the conspiracy lies either in the jurisdiction in which the conspiratorial agreement was formed or in any jurisdiction in which an overt act in furtherance of the conspiracy was committed by any of the conspirators."[218]  Dewberry does not allege that the District of Kansas was an improper venue for the prosecution of the conspiracy given that multiple overt acts in furtherance of the conspiracy were committed by all of the co-conspirators in and around Junction City, Kansas.  In fact, all the overt acts in furtherance of the conspiracy, apart from the acts committed by Dewberry, occurred within the District of Kansas.

Instead, Dewberry contends that venue in the Western District of Missouri would have been more convenient for Dewberry, his counsel, witnesses, and other parties in the case, and would have furthered the interests of justice.  Under Rule 21(b), "the court may transfer the proceeding, or one or more counts, against that defendant to another district for the convenience of the parties, any victim, and the witnesses, and in the interest of justice."[219]  The Supreme Court has suggested the following factors should be considered in determining whether a requested transfer in a criminal case is in the interest of justice: (1) location of the defendants; (2) location of possible witnesses; (3) location of events likely to be an issue; (4) location of

---

[216]Fed. R. Crim. P. 18.

[217]U.S. Const. art. III, § 2, cl. 3.

[218]*United States v. Foy*, 641 F.3d 455, 466 (10th Cir. 2011) (quoting *United States v. Rinke*, 778 F.2d 581, 584 (10th Cir. 1985)).

[219]Fed. R. Crim. P. 21(b).

documents and records likely to be involved; (5) disruption of defendant's business unless case is transferred; (6) expense of the parties; (7) location of counsel; (8) relative accessibility of place of trial; (9) docket condition of each district or division involved; and (10) any other special elements that might affect the transfer.[220]  Dewberry does not discuss how transferring the trial from Kansas City, Kansas to Kansas City, Missouri—where the courthouses are approximately three miles apart— would have furthered the interest of justice under Rule 21(b).

Dewberry further argues that "[a] motion to transfer venue to the Western District of Missouri would have given [the defendant] a more realistic opportunity of being judged by a representative jury of [the defendant's] peers from the urban area in which he resides and in which all of his relevant actions in relation to the case are alleged to have occurred."[221]  To the extent Dewberry suggests that venue in the District of Kansas was prejudicial, this argument also fails.  Under Rule 21(a), the court must transfer a case to another venue "if the court is satisfied that there exists in the district where the prosecution is pending so great a prejudice against the defendant that the defendant cannot obtain a fair and impartial trial at any place fixed by law for holding court in that district."  This rule applies when "prejudice in the community will make it difficult or impossible to select a fair and impartial jury."[222]  To prevail, a defendant must establish that "extraordinary local prejudice will prevent a fair trial."[223]  Additionally, "[t]his rule is intended for cases in which prejudice in the community will make it difficult or impossible to

---

[220]*United States v. Lindemuth*, No. 16-40047-DDC, 2017 WL 2572819, at *12 (D. Kan. June 14, 2017) (citing *Platt v. Minn. Mining & Mfg. Co.*, 376 U.S. 240, 243−44 (1964)); *see also United States v. Calabrese*, 645 F.2d 1379, 1384 (10th Cir. 1981).

[221]Doc. 779 at 26.

[222]*United States v. Walker*, 890 F. Supp. 954, 958 (D. Kan. 1995) (citation omitted).

[223]*Skilling v. United States*, 561 U.S. 358, 378 n.1 (2010).

select a fair and impartial jury."[224]  Dewberry falls short of establishing failure to move venue violated his due process rights.  The record does not support any claim that there was prejudicial pretrial publicity or any issue in *voir dire* that substantiates his claim.  Thus, trial counsel was not ineffective for failing to file a motion to change venue, and this claim is denied.

### F.  Claim Six: Failure to Raise Meritorious Arguments on Appeal

Dewberry devotes merely one paragraph in support of his claim that appellate counsel was ineffective for (1) failing to challenge the jury's calculation of the drug quantities concerning the powder cocaine, and (2) failing to challenge the erroneous admission of hearsay statements in accordance with Fed. R. Evid. 801(d)(2)(E).  As the Government notes, however, Dewberry does not specify how the jury improperly calculated the amount of powder cocaine attributable to him, nor does he state with any particularity what "widespread admission of co-conspirators' statement" violated the rules of evidence.

It is well established that a defendant's allegations within a § 2255 motion must be articulated with particularity and supported by factual averments.[225]  Conclusory allegations will not entitle a defendant to relief.[226]  In addition, Dewberry must demonstrate that appellate counsel omitted a "dead-bang winner" for prejudice to result.[227]  As previously discussed, appellate counsel challenged both the sufficiency of the evidence for the two conspiracy convictions and the jury's finding that he was accountable for 280 grams or more of crack, which

---

[224]*United States v. Gressett*, 773 F. Supp. 270, 277 (D. Kan. 1991).

[225]*See, e.g., United States v. Fisher*, 38 F.3d 1144, 1147 (10th Cir. 1994).

[226]*Hatch v. Oklahoma*, 58 F.3d 1447, 1471 (10th Cir. 1995), *overruled on other grounds by Daniels v. United States*, 254 F.3d 1180, 1188 n.1 (10th Cir. 2001) (stating petitioner's allegations must be specific and particularized, not general or conclusory).

[227]*United States v. Challoner*, 583 F.3d 745, 749 (10th Cir. 2009).

were rejected on appeal.[228]  The Court declines to construct Dewberry's arguments for him

concerning appellate counsel's alleged ineffectiveness.[229]  This claim is denied.

### G.     Claim Seven: *Brady* and *Giglio* Violations

As his final challenge, Dewberry claims that Government counsel violated *Brady v.*

*Maryland*,[230] by failing to provide trial counsel with records showing GPS data collected by law

enforcement officials during the investigation into the drug trafficking organization.  As the

Government correctly responds, however, it provided trial counsel with the evidence in question

on May 22, 2013, in advance of Dewberry's trial.

Dewberry further claims that Government counsel failed to provide trial counsel with

evidence of a statement given by Antonio Cooper to law enforcement officers in an unrelated

homicide investigation in Manhattan, Kansas in 2001.  The Government responds that it became

aware in the fall of 2014 that co-defendant Marcus Roberson intended to file a motion for new

trial based upon newly discovered evidence, namely a statement provided by Cooper to Riley

County law enforcement officials concerning his presence at a shooting in Manhattan, Kansas

that resulted in the death of Shaun Leach.  Roberson filed his motion for new trial on January 29,

2015.[231]  Prior to that date, the Government states that it gathered material related to Roberson's

claims and began to disseminate all relevant material to Roberson's then-counsel, J.R. Hobbs, as

well as to counsel for Dewberry, Dean Sanderford, who was appointed to represent Dewberry

---

[228]*United States v. Dewberry*, 790 F.3d 1022, 1024 (10th Cir. 2015).

[229]*See Garrett v. Selby Connor Maddux & Janer*, 425 F.3d 836, 840 (10th Cir. 2005) (holding *pro se* pleadings must be liberally construed, yet there are limits and the court cannot take on the responsibility of serving as the litigant's attorney in constructing argument and searching the record).  The Court notes that Dewberry was assisted by retained counsel in preparing his § 2255 motion.

[230]373 U.S. 83, 87 (1963).

[231]Doc. 675.

following Ms. Scherff's withdrawal from the case.  On December 18, 2014, AUSA Jared Maag provided Sanderford with all relevant material related to the allegations raised by co-defendant Roberson concerning the statement made by Cooper.[232]

As to the merits of the claim, Dewberry's arguments are indistinguishable from those raised by co-defendant Webb in his motion to withdraw plea and co-defendant Roberson in his motion for new trial.  This Court held that the Government had no duty to discover this particular unrelated testimony by Cooper.[233]  This Court further found that the evidence was neither favorable nor material as *Brady* requires.[234]  For the reasons articulated in this Court's orders denying his co-defendants relief, the same result necessarily applies to Dewberry.  Accordingly, this claim is denied.

## V.     Certificate of Appealability

Under Rule 11 of the Rules Governing Section 2255 Proceedings, the court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant.[235]  A certificate of appealability may issue only if the applicant has made a substantial showing of the denial of a constitutional right.[236]  To satisfy this standard, the movant must demonstrate that "reasonable jurists would find the district court's assessment of the constitutional claims

---

[232]Doc. 790 at 48 (email from Maag to Sanderford and reply by Sanderford acknowledging receipt of materials).

[233]*See United States v. Webb,* No. 11-40078-01, 2015 WL 4275949, at *6–7 (D. Kan. July 14, 2015) (citations omitted); Doc. 700 at 28.

[234]*Id.* 8–9.

[235]The denial of a § 2255 motion is not appealable unless a circuit justice or a district judge issues a certificate of appealability.  Fed. R. App. P. 22(b)(1); 28 U.S.C. § 2253(c)(1).

[236]28 U.S.C. § 2253(c)(2).

debatable or wrong."[237]  For the reasons stated above, the Court finds that Dewberry has not satisfied this standard and, therefore, denies a certificate of appealability as to its ruling on his § 2255 motion.

**IT IS THEREFORE ORDERED BY THE COURT** that Petitioner Kennin Dewberry's Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody (Doc. 779) is **denied** without evidentiary hearing; Dewberry's Motions for Discovery and Evidentiary Hearing (Docs. 819, 827) are **denied as** moot; Dewberry is also denied a certificate of appealability.

**IT IS SO ORDERED.**

Dated: March 23, 2018

S/ Julie A. Robinson
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE

---

[237]*Saiz v. Ortiz,* 392 F.3d 1166, 1171 n.3 (10th Cir. 2004) (quoting *Tennard v. Dretke,* 542 U.S. 274, 282 (2004)).